The first case call for oral argument is Greco v. Orthopedic & Sports Medicine Clinic. Counsel, whenever you're ready, you may proceed. My name is Greg Finlan. I'm representing the Grecos on this appeal. We presented to the court a pretty straightforward issue as our first issue on appeal. Does the plaintiff have an unqualified right to depose a corporate defendant? And does the court abuse its discretion in denying us that right? We believe that the rules are clear. They put the parties on a level playing field. We think we have an unqualified right to take the deposition of a corporate defendant unless something in our conduct or something we've done would take away that right. There is no such instance like that in this case. We believe that this is a clear violation of our rules of discovery. Depositions are the backbone of our discovery rules. To deny us the right to take a corporate representative of a party is just wrong. Well, let me ask you about that. In my reading of the briefs, you wanted to take the deposition of the corporate defendant and the human being that you were going to take as the corporate defendant, if I understand the brief correctly, was the same doctor who is the real shareholder you had already deposed. What would be different? What would distinguish the deposition you have of the doctor as the doctor and whatever expertise he might bring to the stand from your deposing him as the corporate representative? We dispute, Judge, that the doctor would be the only witness that they would call. The rules allow them to designate one or more persons to be deposed. If they wanted to elect a doctor, they could. There are issues that other people would be better suited to answer than the doctor. They gave us the names of two people who would know more about missing x-rays than the doctor. Those were the two ladies whose names were? In addition to that, this issue came up after we had deposed the doctor. They told us in discovery that their experts were going to rely upon x-rays. We filed a request to produce. They said they have their x-rays, they'll produce them. Then they tell us we filed a motion to compel because they weren't produced. Then they go before the court and represent to the court that they never had these x-rays. Didn't they represent that they had them but gave them back to the deceitful? No. On page 8 of the appendix, there's a consent court order. That consent court order says, signed by both attorneys for the defendant, it says we never had the x-rays. This is what they represented to the judge. We never had the x-rays. We looked at them at the hospital. How were the x-rays relevant? The x-rays show a lot of things. One is one of the issues at trial was the severity of the sprain. You can see the shadow of the swelling on the x-rays. Another thing is whether or not the x-rays were properly diagnosed. In Mrs. Greco's case, the x-rays should have shown prior fractures. There's no mention of that in the x-ray reports. They could show a lot of things. It's the only really objective evidence in the case. It would show a few things, maybe not as clear as an MRI or a CT scan or other radiographic studies, but it would show the outline and the swelling in the ankle and possibly some other things. It should show a prior fracture. Did you have an expert that was ready to testify that somehow the severity of the fracture increased the risk of the development of a DVT? No question. Every expert testified that the greater the injury, the more likely the DVT would occur. So if there was a severe fracture, that would be a much greater risk, and I think they all agreed to that. There was a battle about how to grade this sprain. And the battle being we wanted their records to say it was a severe sprain, and then they wanted to kind of curtail that a little bit. But the more severe it was, the more likely that there was blood issues involved and clotting issues involved and DVT possibilities. The briefs indicate that you didn't file a motion to quash or an opposition to the motion to quash the corporate deposition. Is that true? The defendant filed a motion to quash. You had no opposition that was filed. Well, it occurred in a very unusual fashion. We didn't have notice of a hearing. I was sitting at my desk at 2 o'clock on an afternoon. I received a phone call from the judge saying he wanted to hear the motion. We were going to prepare a response. But I've never had a case where I've not been allowed to depose the opposition. Never had that. I mean, I don't know what you filed. You cite the rule to the court. You bring the rule to the judge in oral argument and say, you know, is there a case that says we can't depose our opponent? I mean, there's not really much to brief on that. Was there a telephonic conference or hearing then on that motion to quash the clinic's deposition that you participated in? Were you heard on that? I was heard. I was in my office in St. Louis, and I was heard on it, yes. And you did object to it at that time? Yeah, I did. It was a long objection. And I was trying to explain to the judge that, you know, this notion about redeposing somebody and going over the same issues was not true. Because these issues came to fruition after his deposition. We always assume they have these x-rays. And, you know, we had a right at this point when there's misrepresentations to the court and there's changes of interrogatory answers under oath, I think we have a right to inquire about that and probably have a duty to inquire about that because it's strange. You know, where are the missing x-rays? And we dispute, and we've always disputed, that they were given back to Mrs. Greco because when she went there the last time, it was an emergency visit. She wasn't being discharged. There was no reason to give her x-rays back at that point, especially when they kept them after the first visit if they really had them. You know, she was due for another office visit, and they would keep them, I would think, to compare them if they needed to later on down the road. They weren't found in her car. They weren't found in her belongings. They disappeared. Did you go to or did you contact St. Anthony's about that? We did. We certainly did. I mean, you know, we went down that road. But let's assume they're never found. How does that change your case? Well, we have a right to know if they were destroyed, too. So, and if they were destroyed, we think we're entitled to presumption. In fact, there's one case that allowed us a jury instruction on that issue and won the spoliation. So we don't know how we're prejudiced when we can't see something. But if it was intentionally destroyed, we're entitled to a presumption on that. And these other two witnesses, Ms. Eman and Ms. Groff, were identified in interrogatory's answers as people who have knowledge of how their X-rays are stored, how they obtain them, what documentation there is. They gave us these names. So not only did we want to depose a corporate representative, we wanted to depose these people because they were told that they're witnesses to this. So it's more than just a corporation, you know. It's – and being on this side, you feel like, you know, it's a cat and mouse game. You know, we're entitled to this information. We're entitled to discover it. Let me refresh my recollection on the court not allowing you to take the deposition. Were there stated reasons that the court gave you? Was it close in time to the time of the trial? Would it have delayed the trial? I'm not asking you to speculate. I'm just asking you to refresh my recollection of what's in the record as to why you were denied that. The only thing in the record was the motion, the motion to quash that was filed by the defendants. And then there was the oral argument on the telephone. But that oral argument is not in the record. No, it's not. And there's no bystander's report that's been filed. There's no what? Bystander's report. There's nothing in the record that would allow us to learn what the judge's reasoning was, correct? Right. There's just the court order. Right. The defendants claim in their briefing that the court actually modified its case management order to accommodate these depositions. Is that true? We asked the court to put in the names of these two witnesses and allow us to depose them. And he put that in the amended case management order. It's in paragraph two of the case management order. And so then I filed a notice of deposition. And there was a dispute about the date. So they gave us a date. I filed an amended notice of deposition. No witness showed up. And then we filed a motion to compel. And for whatever reason, the court would not entertain that motion. We asked the court to set it and allow us to be heard on it. And it was very frustrating that that was not ruled on directly by the court. So this motion was filed after you sent a notice, an amended notice, and no one showed up? Right, that's correct. Did you appear for the deposition? I mean, did they call you? Did they tell you? They called us the day before and said, you know, we're not going to attend. We're not showing. And that was good enough for us to just, you know, go file a motion to compel. I don't think they'll dispute that there was notice twice and no one attended the show. The judge refused to rule, as I understand it. Yes, ma'am. What about your argument on the 213 issue? Are you arguing that as well before us, or are you not concerned about that? I am. Well, you know, this is another, I know the court is used to ruling on this. It's very standard. These are mandatory rules, and the purpose of Rule 213 is to not allow for ambush or surprise at trial. And three witnesses came to court, three of the defense witnesses came to court with changed testimony. And they were allowed to change their testimony. And I would ask the court to consider Dr. Gill. Dr. Gill was a pathologist, took his deposition, asked him for all of his opinions, went through all of his opinions, asked him what he looked at, asked him whether he intended to look at anything else, and asked him did he need to look at anything else. He said, no, I'm basing my opinions on the medical file. I don't need to look at any depositions. I don't need to look at anything else, and these are my opinions. And after that was done, and I think this is underhanded, the defense sends him all the depositions and asks him to change his testimony based upon these depositions. That's improper under our rules, and they brought him to court knowing that he was going to change his opinion and did not notify us. And that's a flat violation. With Dr. Vest, he was allowed, and by the way, we were allowed to take a second deposition of him, but only as to his opinions as an expert, but he changed his opinions. He bolstered all of his testimony with unsighted references to literature, to articles, to things that were not provided to us in advance, to things that were never disclosed to us. And we're there in front of a jury trying to win a case, and you have some decisions to make as a lawyer. What do you want to look like in front of this jury with this witness giving you some information? But I don't think that was fair either. I think that was far from it. Again, that's ambush and surprise. The defendants, though, claimed that you didn't object to the testimony of Vest or Gill, and you didn't put it in a post-trial motion. Well, we filed a motion in limine asking for no new opinions. I'm sorry, you filed a motion in limine for? And asked the court not to allow any new opinions. Okay, so that was done. Yeah. Throughout the trial, we asked the court to not allow any new opinions, and the post-trial motion speaks for itself. I think it was sufficient to, again, alert the judge that these are new matters, and he allowed a lot of discussion on that post-trial, but the motion speaks for itself, so I would ask you to- And what about the sister who was allowed to testify? Again, we posed to her and took her testimony, and she was allowed to testify about an issue that arose in the trials, whether or not the family of Tammy Greco had a blood clotting disorder. She was allowed to testify. It's a surprise to us that she went to a doctor and she was allowed to testify as a lay witness, what her doctor told her, and what she believed her condition was, being a blood clotting disorder. Now, Pelley's brief says, well, this was coming up throughout the trial, but nobody was going to present any evidence on it at trial, and even if they did, it doesn't change the rules of evidence. The rules of evidence don't allow for a lay witness to testify about hearsay matters that their doctor told them. And I know, because I handled that witness at trial, I know that there were timely objections to that, and the judge denied those. We had a motion before the witness took the stand, and we had a motion, a timely objection during her testimony, and it was preserved. Should she be allowed, that's an issue for a peer, should she be allowed to testify on these undisclosed matters, and also as an evidentiary matter about hearsay that her doctor told her, and how she understands those as a lay person. And we believe that's an evidentiary ruling that should be cleared, even under the more liberal new rules. So that's the substance of our case, but I just, you know, sometimes you go, I'm sorry. I'm sorry to interrupt. Was Dr. Vest allowed to read from medical literature? No, he recited to unspecified literature that he learned at a recent conference he attended, without telling us, you know, what the literature was, who the author was. And he didn't bring it with him at trial. No, he didn't. So, sometimes when you go through a trial like this, it was, you know, and three witnesses come before the court, all defendants' witnesses, and they bring surprises with them. It's not a coincidence, and our rules are designed to prevent it. This is not a case where we weren't diligent. Everybody that took the witness stand had been opposed. We knew what they were going to say, and we just asked that the court not allow this. I mean, that's why we have Rule 13 disclosures. Was the- Excuse me. Was the decedent's sister cross-examined as to any kind of potential or prejudice against the decedent? Judge, I heard about half the- I'm sorry. I'm sorry. Was the decedent's sister testified about this family blood disorder she was told about by a doctor? Was she cross-examined about any bad blood or potential problems with either the decedent or the decedent's family, as far as her prejudice was concerned, that you allege in the brief? She let it out in a direct. She said, I don't believe in any of this. So she let her prejudice be known in her own statement. So I didn't touch it on the grounds. Thank you for your time. Thank you, counsel. Counsel? May it please the court? Counsel? Apparently you all are making me nervous today because I need to take a drink of water here. Go right ahead. Okay. Good morning, Your Honors. Good morning. With that, I can actually talk. I guess we can start at the beginning with the depositions of the corporate representative and the two employees that Greco's asked to depose. And I think I'm going to pull those apart a little bit because those are two separate issues. The two employees that were asked were not asked to be produced as corporate representatives, nor could we have done so. The issue with Dr. Vest, I think you touched on briefly, is that Dr. Vest really was the only corporate representative that could be provided. As far as speaking as an agent, he's the sole shareholder. He's the guy. He had been deposed. Plaintiffs had already asked to depose him a second time. That second request is denied by the trial court, and that is not raised in the appeal. And it is that that we were reacting to. It's that that the trial court was reacting to, that this was just an end run. It was an attempt to take yet another deposition of Dr. Vest, and contrary to the prior order requesting a second deposition. We do believe that there is a preservation issue in this case on this issue by the fact that there is no record and there is no written objection. The reason for that is because you have to determine that it was a manifest abuse of the court's discretion. Here we don't know what objections that the trial court even was considering or rejecting that were brought by the plaintiffs because there's simply no record of the same. I am at a slight disadvantage here because I'm only the appellate attorney. I was not one of the trial attorneys, and so I'm, like you, stuck with the record. So I don't know what happened at the teleconference. It's my understanding that from counsel that a teleconference happened. My trial attorney said that he remembered there was a conference happening. He couldn't remember specific statements about it. You know, he said it was a small hearing early in the case, and so I'm, like you, stuck with the record. And I know that what we asserted was that this was an abuse of the discovery process in trying to get yet another deposition with Dr. Vest. And that it was over an issue that had already been determined in the written discovery. Why do you say that he was the only person that could have been produced and these other two women could not have? Well, because as a corporate representative, they just didn't have the knowledge that a corporate representative would. So if they had dealt in the only knowledge that they, you know, purported to have had to do with the location of x-rays or, you know, the handling of x-rays. And so, you know, absent some kind of limitation to a corporate representative deposition, they simply could not have been provided as that. But if they had that knowledge, they could state it on behalf of the corporation. Well, I'm not saying that they couldn't have. Right, right. I mean, they could have been deposed as employees, and as employees, their statements would have adhered to the employer. But I think that that's something different than the corporate representative. And so, you know, under the rules, I guess we're allowed to choose who the corporate rep is and it's his company and, you know. I'm not so sure about your answer. Okay. There wasn't any dispute that this medical corporation was properly incorporated and in compliance with everything Illinois needs it to be in compliance with and everything. The issue of the x-rays was a persistent issue. What would have led you rationally to think that a deposition of a corporate representative was about anything other than the specific treatment of these x-rays and the usual and customary treatment of x-rays of patients, both their intake, their use, their ultimate disposition, including being given back to the patients? Mainly just because I didn't see anything in the record that so limited the deposition. No, I understand that, and you made that point clearly. Right. You know, it was a general notice of a deposition. Right. What else in the context of that notice would give you any indication that they were going to ask a corporate representative anything other than the treatment of x-rays? Well, mainly because they were – I mean, again, other than the fact that they were just seeking a regular corporate rep depo, as well as the depo of two employees. And so presumably they were going to get the x-ray information from those two employees, and it left the corporate rep depo open, as well as the fact that they were, at the same time, openly seeking additional deposition testimony from Dr. Best outside of the issue of the x-rays. And so it was, you know, it was those combination of things that, you know. How do you know that? That's what I'm trying to figure out. Did the deposition notice say that? The deposition notice of the corporate rep. Did they say they're seeking deposition of Dr. Best outside the scope of the x-rays? No. The reason that I know that is because they had sought a second deposition from Dr. Best prior to this issue. And the reason that that deposition was denied is because they were seeking to go back over testimony that he had had before. Because the x-rays weren't an issue, that was additional testimony. Was the testimony of Dr. Best taken during the first lawsuit or the second? I don't know the answer to that. I apologize. Because the corporate rep. deposition rule says that the corporation can designate anybody who can respond to the information that's being requested. It doesn't have to be the sole shareholder. So I'm not sure why you're saying that these two women couldn't have been designated. All I can tell you is that we would not have designated them as that because they didn't have the full breadth of knowledge that a corporate rep would have. Well, the full breadth of knowledge regarding what? Well, it would be everything from how the company was run, including any financials, including whether or not Dr. Best could provide expert testimony. The corporation technically could talk about Dr. Best as an employee and his actions. So the depo notice was not limited in any way. Right. That's your real complaint. Right. And so we would never offer up employees that we didn't think could, because we would be stuck with their testimony if we offered them as a corporate rep. And so we would only have offered Dr. Best because he would have the breadth of knowledge necessary. Now, on the issue of the two employees, again, I'm at a bit of a disadvantage in the fact that I am working only off of the record. I believe, counsel, that there were depo notices put up. I'm not going to dispute that because I don't have anything that says otherwise. But what I can tell you is that there's simply no ruling. He's appealing from the denial of his motion to propel when there was no denial of the motion to propel. I think that that is a preservation issue that simply ends the action or that particular issue right there. On a substantive level, I think that if you look at the record, it is clear from the beginning that the corporation, that the clinic said they did not have the x-rays. It is not in the course of their normal course to keep x-rays. They didn't keep them in this case. They didn't have them. I understand the order that he's referring to, that there was a statement about going to the hospital to review those. And I don't know what that's about. But at the end of the day, it doesn't matter if they went to the hospital or if they looked at them in their office or if they gave them back. At the end of the day, they don't have them. That's the only information that he would have gotten out of those depositions is that, no, in fact, they don't have them. And that was information that they already had. And so, you know, to the extent that the court is deemed to have denied that motion in some way, that's what I would say is simply that, you know, that they would not, that the depositions ultimately would have been irrelevant and that there's no prejudice at the end of the day. Plaintiffs are now claiming that maybe she had a broken ankle. They never disputed during the litigation that St. Anthony's improperly looked at those x-rays or did anything wrong in coming up with their radiology report. Well, how can they do that without the x-rays? Well, what I guess I'm trying to say is that that's an issue that's being raised now. It's a lawyer-made issue. That's not something that their experts looked at and said, we think this woman must have had a fracture. We need to see the x-rays. During the litigation itself, the only reason that they gave for wanting their experts to look at these x-rays is because they thought our experts had looked at the x-rays. And, in fact, we never said that our experts looked at the x-rays. We said they looked at radiological materials, which we clarified was the report. We looked at the radiology report that was issued by St. Anthony's. And, you know, and so I guess that's what our issue is with that is simply that that's not something that was an issue in the case. That's not something that was ever disputed. It wasn't disputed in their petition. They didn't bring any allegations against St. Anthony's. It wasn't disputed during trial. In fact, they over and over again told the jury that this was not a disputed issue, that it was undisputed that she had a sprain to her ankle. And so they tried to raise that issue. They also tried to say, well, there may have been spoliation. If they thought there was spoliation, they had enough to raise it. There was, again, nothing more coming from those depositions. With no ruling on the motion to compel. And as I understand Mr. Finland's argument, the plaintiff asked the court to hear the motion to compel and maybe it didn't get heard. Is there anything in the record to support his argument that the court refused to hear the motion to compel, that it was called, or a motion made by the plaintiff that the motion to compel be heard? Anything like that in the record to support that? There's nothing that I saw in the record that supports that there was an effort. I think that somewhere in the brief, and if I remember this wrong, counsel, please correct me, that he raised it during that same teleconference hearing on the Dr. Vest, on the corporate representative deposition. But again, we have no record of that telephonic conference. We have no bystanders report. And it's up to the appellant to show there's an abuse of discretion. Right. And if, in fact, the court misbehaved in refusing to hear a motion, that would clearly be misbehavior by the trial court that you would want to address. But to my knowledge, they still have the onus of laying down a record showing that that misbehavior had occurred. They're either filing a motion to have it, you know, filing something in the record to indicate that that actually happened. And so in the interest of time. We do have in the record a motion to compel the depositions of Mann and Groff. Yes. Because is it true that you call, your trial lawyers called the plaintiff and said we're not showing? Again, I don't know that because it's not in the record. And so I don't know that for a fact, but I'm not disputing it. I mean, I'm assuming that what he's saying is true. Well, it's a little disconcerting to the court that, and I mean no disrespect to you. Right. But you're very limited in what you can argue. Well, I am limited to the record. I mean, which, you know, I think is what we're limited to. Right. I mean, and so I'm arguing in the same breath of what the court can consider. So we do have a court that has a motion to compel the depositions of the two people who were told have knowledge of the x-rays. Right. And the judge never rules on them. Right. And under Illinois law, that is deemed waived. I mean, it is the onus of the parties. It's deemed waived because it wasn't in the post-trial motion? Well, no, it's deemed waived because they never, they didn't get a ruling on it. And it is the parties, the onus is on the party to get a ruling. If they never seek a ruling from the court, then they waive that, you know, the motion is deemed waived. And that's what we have here. And I would argue, even if they did raise it in that teleconference hearing and the court said, I'm not going to hear it today, we're not talking about this today, they needed to go back and ask the court for a ruling again. And if, and like I said, if the court was going to go, it was misbehaving and saying, I'm not going to deny your motion, I'm just not ever going to hear it, I'm never going to consider that motion, that should have been something, again, that was laid down on the record in some way. So. I'm curious to move on to the 213 issue. Right. If you would. In your brief, the defendants indicate that the sister, her testimony was not being used to prove that she actually had a clotting disorder or that her testimony had anything to do with her sister. So my question is, if that's your claim in your brief, then what else would it be used for? I guess what we're making here is this distinction in a hearsay statement as to whether or not a statement is made versus whether or not a statement is true. And here, whether or not she had DVT was not an issue in the case. Whether or not the sister had DVT was not an issue. What we're talking about is whether she had family history. It's still a hearsay, though. Well, only if it is admitted for the truth of the matter asserted. Well, isn't, I mean, that's what I'm asking. Right. If you're not admitting it, then what are you admitting it for? Well, here, it's the same thing. In other words, there was no main trial on whether or not the grandmother, there was testimony, you know, throughout the trial that the grandmother had DVT. Well, there was no main, you know, trial trying to determine whether or not the grandmother actually had DVT. But who introduced that testimony? It came in from both sides. But who introduced it? A physician? Oh, it was both, James Greco talked about a family history of DVT as well as experts on both sides. So the experts could rely on medical records. Right. Which we all recognize is okay. I mean. Although there's no evidence that they had medical records of those, of the grandmother or the aunt. No, but the medical records, is it true that they would show a history in the family of DVT? That's what my understanding is, yes. Okay. And the sister was not in those medical records? No, because she had not been diagnosed with DVT at the time of those medical records. She was actually diagnosed after her deposition, and we only learned of it during the trial itself. So you don't think that's a change of the opinions or disclosures? Well, okay, as far as just the Rule 213 goes on her, I don't think it's a change of opinions because I don't think she's offering an expert opinion. And I think that she was presented as an expert. I don't think she meets any of the qualifications of an expert, and she didn't present any expert testimony. As far as the 213, the reason that there's no violation of 213 there is because that is to prevent surprise. Well, she told us during the trial that she had been diagnosed with DVT. We immediately informed the plaintiff's counsel of that. So my understanding is within, you know, minutes that we turn around and let them know. And so we were in the same position as they were. There is no violation of 213 because we didn't withhold information beforehand and spring it to them at trial. We didn't tell her not to tell us. In fact, my understanding is that she was diagnosed only weeks before the trial and that she informed us when she got there. And so as far as the 213 issue in that case, I just don't think there is. And, you know, as far as Kristen Dover's testimony is, I just don't think that there is one. Then explain to me how that is not impermissible hearsay. And the reason I would say it's not impermissible hearsay, again, is because she wasn't telling the jury that she had been diagnosed with DVT. She wasn't telling them what her doctor was saying in order to prove the truth of the matter asserted. In other words, we weren't testing whether or not her doctor properly diagnosed her with DVT. What we were talking about is the fact that others in the family had a history of DVT, had been diagnosed with DVT, and that that's a risk factor that has to be considered in Plaintiff's condition and that it has an impact on that, on the potential standard of care. And so what we were trying to show is that, in fact, there was medical history out there that we didn't know at the time that we were diagnosing her, but there was further diagnosis. So. And then just on the issue of prejudice, really quickly on the same, on Kirsten Dover's testimony, I would say that what we're talking about here is setting it back for another trial where the jury still gets to hear that the mother and the grandmother had DVT, just not that the sister had DVT. And so at the end of the day, this just isn't the testimony that turned the verdict. They say, well, this all of a sudden allowed the jury to speculate about what the cause, you know, of her injury was. In fact, it was just another family member coming forward as having DVT. It was a family history that had already been established. And so very quickly, I would urge the court on the third point on Gill's and Vest's deposition to look closely at the preservation issues as well as the prejudice issues on those. I think the substantive argument holds up as well. But I think at the end of the day, Vest simply came in and relayed statistics that pretty much comported with what everybody else, every other expert was saying in this trial. And it wasn't a new opinion. They knew what his opinions were going to be. They're saying this is a new basis. And it really is just a specification. I think under the Matthews case, it's clear that that's something that would be allowed. As far as Dr. Gill, the debt was in the details on this issue. And I don't have time to walk you through the details here. But what I will tell you is that the only deposition testimony that they argue had changed was for Dr. Nanduri. Dr. Nanduri is not one of the questions that they are talking about today or in this appeal. I think that the lines got crossed. And in doing so, that was simply waived. Thank you, counsel. Thank you. Counsel? Just briefly, I don't want the court to be misguided by the corporate defendant here. This is not a two-, three-person medical office. There are 70, 80 employees of the defendant. They have office managers. They have Dr. Spafford there. Dr. Vest spends most of his time in surgery in a hospital away from the office. There are plenty of employees who could come in, testify about their procedures, about what's done with x-rays, about how things are stored, how things are documented when they receive them, when they return them to the patient. So this is not only two people. If they didn't want to produce Dr. Vest, they should have been required to produce somebody else. And we're entitled to that deposition. It should be an unqualified right unless there's some misconduct on our part. There is not. About the, nobody in this family had a diagnosis of DVT. DVT is a life-threatening condition. There are many types of blood clotting disorders. And whether or not these are compatible with the DVT clotting issue in this case is a question only experts can testify about. And I would submit that the testimony which Dover was submitted solely for the issue of proving that there are blood clotting disorders in this family. It has no other purpose other than to prove that issue. And that was the objection. And these were argued before the court timely. And they're squarely before this court. Because the only real issue in this case was causation. What caused this DVT. This information is prejudicial. The jury was left with one decision. What caused this DVT? Was it hereditary? Or was it related to the care and the lack of instruction that she gave? And we submit that this should be retried because of this. It was allowed to go to a jury in this fashion. Thank you for your time. Thank you. We appreciate briefs and arguments of counsel. And we'll take the case under advisement.